

DA 07-0076

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 207

DYLLON R. ROBERTUS,

      Plaintiff and Appellant,

  v.

FARMERS UNION MUTUAL INSURANCE COMPANY,

      Defendant, Appellee, and Cross-Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 05-0257
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Steven J. Harman and Donald L. Harris, Cozzens, Harman, Warren & Harris,
Billings, Montana

      For Appellee:

          Guy W. Rogers and Matthew I. Tourtlotte, Brown Law Firm, Billings,
Montana

Submitted on Briefs:  February 13, 2008

Decided:  June 16, 2008

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Dyllon Robertus (Robertus) appeals from an order of the Thirteenth Judicial District, Yellowstone County, denying his motion for summary judgment. Farmers Union Mutual Insurance Company (Farmers Union) cross-appeals from the District Court's judgment following a jury trial. We reverse and remand for new trial.

¶2 Robertus presents the following issues for review:

¶3 Whether the District Court properly determined that Farmers Union effectively had notified Robertus of a change in his insurance coverage.

¶4 Whether the District Court properly determined that the modified insurance policy precluded Robertus from stacking his underinsured motorists (UIM) coverage.

¶5 Farmers Union presents the following issues for review:

¶6 Whether the District Court properly allowed Robertus to testify regarding a claim for future lost earning capacity.

¶7 Whether the District Court properly instructed the jury on Robertus's future economic losses.

¶8 Whether the District Court properly allowed a mortgage banker to testify as a non-expert regarding interest rates as they relate to determining the value of future economic losses.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶9 Robertus sustained serious injuries to his back in a car accident on December 12, 1997, when he was 15 years old. Robertus had been driving a pickup truck insured under a

Farmers Union policy issued to his parents. The driver of the other vehicle admitted liability. The other driver's insurer paid Robertus and his parents the liability policy's $50,000 limit. Robertus's injuries have required ongoing medical treatment at a cost far in excess of $50,000. Farmers Union agreed to pay up to $300,000 of UIM coverage.

¶10 Robertus's parents purchased their Farmers Union policy in December 1994. The parties renewed the policy the following December of each year leading up to the accident. The policy covered the Robertus family's seven vehicles. The policy specifically included $300,000 uninsured motorists (UM) coverage and $300,000 UIM coverage. Farmers Union charged the Robertuses separate premiums for UM/UIM coverage for each vehicle from 1994 to 1996. Farmers Union indicated the UM/UIM charges on the policy's declarations page. The declarations page listed each vehicle separately along with the UM/UIM coverage limit and the specific amount of the premium for the listed vehicle. The declarations page appeared as follows:

| VEH NO. | <------------ UNINSURED MOTORISTS ------------> | |
| --- | --- | --- |
| | LIMIT | PREMIUM |
| 001 | 300,000 | $37.00 |
| 002 | 300,000 | $37.00 |
| 003 | 300,000 | $37.00 |
| 004 | 300,000 | $37.00 |
| 005 | 300,000 | $7.00 |
| 006 | 300,000 | $7.00 |
| 007 | 300,000 | $37.00 |

¶11 Farmers Union had taken notice of the trend in Montana toward allowing stacked payments for UM/UIM coverage where the insured had paid separate premiums for multiple vehicles. Farmers Union modified the way that it charged policy-holders for UM/UIM coverage in 1996 in an attempt to avoid stacking of UM/UIM coverage. Farmers Union changed the Robertuses' UM/UIM coverage when the parties renewed the policy in

3

December 1996. Farmers Union modified the policy's UM/UIM coverage to charge the Robertuses a single premium for all seven of the Robertuses' vehicles. The change decreased the total amount that the Robertuses paid for UM/UIM coverage for the seven vehicles from $199 to $116. Farmers Union intended that the modified policy would limit its UM/UIM obligation to the Robertuses to $300,000 per occurrence.

¶12    Farmers Union did not send a separate notice of the change to the Robertuses. The policy's declarations page provided the only indication that Farmers Union had changed the Robertuses UM/UIM coverage. The declarations page previously had listed each vehicle along with the amount of UM/UIM coverage for that vehicle. Farmers Union simply replaced the column showing the separate UM/UIM premium charged for each vehicle with the word "included." Farmers Union listed a total UM/UIM premium amount separately at the bottom of the list. The new declarations page appeared as follows:

```
VEH   <------------------- UNINSURED/UNDERINSURED MOTORISTS ------------------->
NO.          LIMIT OF INSURANCE (PER OCCURRENCE)                         PREMIUM
003          300,000                                                    INCLUDED
004          300,000                                                    INCLUDED
005          300,000                                                    INCLUDED
006          300,000                                                    INCLUDED
008          300,000                                                    INCLUDED
011          300,000                                                    INCLUDED
013          300,000                                                    INCLUDED
                  UNINSURED/UNDERINSURED MOTORISTS PREMIUM               $116.00
```

¶13    Robertus brought this action against Farmers Union on March 4, 2005, alleging that Farmers Union had failed to pay to Robertus the full amount of UIM coverage required under the policy. Robertus moved for partial summary judgment on the issue of coverage. He argued that Farmers Union's failure to notify him properly of the change in coverage

4

rendered the policy modification void pursuant to § 33-15-1106(1), MCA (1995), thereby entitling him to up to $2.1 million in UIM coverage.

¶14 Farmers Union filed its own motion for summary judgment. Farmers Union asserted that it effectively had prevented stacking under the policy by charging a single premium for each vehicle under the Robertuses' policy. Farmers Union contended that the decreased total UIM coverage and the modified declarations page in the December 1996 policy constituted sufficient notice to Robertus of the change in coverage.

¶15 The District Court decided that the modified policy excluded Robertus from receiving stacked payments pursuant to *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 47, 315 Mont. 107, ¶ 47, 67 P.3d 892, ¶ 47, in light of the fact that the policy charged a single premium for UM/UIM coverage for all seven of the Robertuses' vehicles. The District Court arrived at seemingly contradictory conclusions, however, regarding whether the policy modification constituted a change requiring notice. The court determined first that the modification constituted a change requiring notice pursuant to *Thomas v. Northwestern Nat. Ins. Co.*, 1998 MT 343, ¶ 19, 292 Mont. 357, ¶ 19, 973 P.2d 804, ¶ 19. By contrast, the District Court determined that the modification did not constitute a change requiring notice under § 33-15-1106(1), MCA (1995). The court concluded, in any event, that Farmers Union had satisfied any statutory notice requirement because the decrease in total UM/UIM premiums charged and the changed format of the UM/UIM declarations page should have put the Robertuses on notice of the change in coverage.

5

¶16     The case proceeded to trial to determine the amount of compensatory damages to which Robertus's injuries entitled him.  Robertus based his future lost wages claim on the fact that his injuries caused his physical capacity to deteriorate and eventually would limit his wage-earning abilities.  Farmers Union submitted its first discovery request to Robertus on May 4, 2005, including an interrogatory regarding future lost wages.  Robertus responded on June 2, 2005, that he could not provide an answer to this interrogatory without an expert opinion.  Robertus asserted that he would supplement his answer after consulting with an expert.

¶17     Farmers Union submitted a second interrogatory on October 25, 2006, requesting supplemental answers, including supplementation regarding Robertus's answers to the interrogatory regarding future lost wages.  Robertus responded on November 22, 2006, more than two months after the close of discovery and six months after the deadline to disclose expert testimony.  He reported that he earns $65 per hour as a welder, and that he would be required to accept significantly less if his injuries required him to quit welding in favor of teaching high school level industrial arts.  Robertus did not elaborate on how he would present evidence of lost wages.  Farmers Union filed a motion in limine to prohibit Robertus from presenting evidence regarding his claim for future lost earning capacity without expert testimony.  Farmers Union asserted that such testimony would be speculative and lack foundation.

¶18     The District Court allowed Robertus to testify regarding future lost wages, but it limited his testimony to "the amount of compensation he receives currently as a welder."

The court determined that Robertus lacked the qualifications to testify as to future wages, interest rates, or other financial projections. The court ordered Robertus to rely on other sources for any evidence regarding future wage loss. Robertus filed a brief on January 13, 2007, three days before trial that announced his intention to testify regarding the average wage for secondary school industrial arts teachers in Montana in order to prove future lost wages. Farmers Union responded that the brief constituted an untimely discovery response and that the proposed evidence regarding teacher salaries lacked foundation. Farmers Union argued that Robertus's dilatory discovery tactics severely impaired its ability to defend as Farmers Union had not had the opportunity to prepare witnesses, expert or otherwise, to rebut Robertus's vocational claims.

¶19 The District Court nevertheless allowed Robertus to testify as to the amount of compensation that he received as a welder pursuant to the court's instructions. Robertus's counsel also questioned Robertus during trial about his knowledge of teacher salaries. Farmers Union objected for lack of foundation, speculation, and late disclosure. Robertus presented two documents not previously disclosed to the court to demonstrate that the information Robertus intended to present constituted a matter of public record. The first document, from the U.S. Department of Labor website, showed the average wage for secondary school industrial arts teachers in Montana. The second document, the Billings Public School District Master Agreement, showed the starting salary for a beginning teacher with a bachelor's degree and no experience. The District Court refused to allow Robertus to testify as to the average wage for a secondary school industrial arts teacher in Montana as

7

this information was too vague. The District Court took judicial notice of the starting salary for a beginning teacher with a bachelor's degree and no experience, and allowed Robertus to testify to this information.

¶20 The court settled jury instructions. Farmers Union objected to Robertus's proposed instructions regarding future lost earning capacity based upon lack of foundation, late notice, and speculation. Farmers Union also objected to Robertus's proposed instructions regarding adjustment of future economic losses to present cash value based upon lack of foundation absent expert testimony. The District Court determined that Robertus had presented enough evidence about future earning capacity to the jury to warrant the instructions.

¶21 Robertus's brother, a mortgage broker, testified regarding interest rates as they relate to determining present value of future economic losses. Farmers Union objected on the basis that Robertus had not disclosed his brother as an expert witness. The District Court allowed Robertus's brother to testify as a non-expert witness regarding a fair rate of return for a safe investment.

¶22 The jury awarded Robertus $1,375,292. Farmers Union already voluntarily had paid $220,422 to Robertus. The court previously had limited Farmers Union's UIM coverage to $300,000 in light of its determination that Farmers Union's policy modification effectively had avoided stacking of UIM coverages. The District Court ordered Farmers Union to pay Robertus the remaining amount of $79,577.

## STANDARD OF REVIEW

¶23 We review de novo a district court's decision to grant summary judgment using the same criteria applied by the district court under M. R. Civ. P. 56. *Walters v. Luloff*, 2008 MT 17, ¶ 17, 341 Mont. 158, ¶ 17, 176 P.3d 1034, ¶ 17. A district court properly grants a motion for summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Walters*, ¶ 17. We review for abuse of discretion a district court's determination of the admissibility of the evidence. *State v. Roedel*, 2007 MT 291, ¶ 35, 339 Mont. 489, ¶ 35, 171 P.3d 694, ¶ 35.

## DISCUSSION

¶24 *Whether the District Court properly determined that Farmers Union effectively had notified Robertus of a change in his insurance coverage.*

¶25 The District Court addressed the parties' summary judgment motions in a 21-page order and memorandum. The court, in its own words, "travel[ed] through the looking glass" to address alternate and hypothetical bases for granting partial summary judgment to Farmers Union, in addition to reaching dispositive issues. As such, its order and memorandum reaches several different conclusions. We shall attempt to clarify.

¶26 Whether an insurer has provided adequate notice of a change in insurance coverage requires a two-step analysis. Contrary to the District Court's analysis we first must determine whether the policy modification constituted a change in coverage requiring notice under § 33-15-1106, MCA. We then must determine whether the insurer provided adequate notice of the change in coverage. *Thomas*, ¶ 29.

I.

¶27 Section 33-15-1106(1), MCA, governs an insurer's duty to notify an insured of certain policy changes. Section 33-15-1106(1), MCA (1995), the version of the statute applicable to Robertus's claim, provides in relevant part:

> If an insurer offers or purports to renew a policy but on less favorable terms, at a higher rate, or at a higher rating plan, the new terms, rate, or rating plan take effect on the policy renewal date only if the insurer has mailed or delivered notice of the new terms, rate, or rating plan to the insured at least 30 days before the expiration date.

*Thomas* also clarified that "when an insurer renews a previously issued policy, it has an affirmative duty to provide adequate notice to the insured of changes in coverage."

*Thomas*, ¶ 19.

¶28 The District Court considered both the 1995 version of the statute and *Thomas* when it addressed whether Farmers Union effectively had modified Robertus's UIM coverage in December 1996. The District Court asserted that this Court did not prohibit anti-stacking clauses for UIM coverage until 1998 when it rendered its second opinion in the dispute between Farmers Alliance Mutual Insurance Company and Kristi Holeman. *Farmers Alliance Mut. Ins. Co. v. Holeman*, 1998 MT 155, 289 Mont. 312, 961 P.2d 114 (*Holeman II*). The court thus reasoned that Montana law permitted stacking clauses for UIM coverage at the time of Farmers Union's 1996 modification. The court nevertheless determined that the modification actually constituted a change in coverage because *Dempsey v. Allstate Ins. Co.*, 2004 MT 391, ¶ 37, 325 Mont. 207, ¶ 37, 104 P.3d 483, ¶ 37, had rendered retroactive the prohibition on anti-stacking for UIM coverage announced in *Holeman II*.

10

¶29    The District Court next discussed whether the modified UIM premium charges constituted less favorable terms, a higher rate, or a higher rating plan under § 33-15-1106(1), MCA (1995).  The court reasoned that the modification only could be considered to have been on less favorable terms if it had been certain in December 1996 that Montana law would allow stacking of UIM coverage.  The court conceded that the modification potentially would have had the effect of reducing Robertus's UIM coverage from $2.1 million to $300,000.

¶30    The court examined our stacking precedent and again determined that Montana did not recognize stacking of UIM coverage until January 1998 when this Court announced its decision in *Holeman II*.  The District Court decided that the modification did not present Robertus with less favorable terms when Montana law did not entitle Robertus to stack UIM payments, either before or after the modification. The District Court concluded therefore that the modification did not constitute less favorable terms that would require notice under § 33-15-1106(1), MCA (1995).

¶31    The District Court nevertheless analyzed separately the adequacy of the notice pursuant to *Thomas's* requirement and the statute's requirement.  It is true that *Thomas*, in part, analyzes an insurer's duty to notify under the common law.  *Thomas*, ¶¶ 24-27.  *Thomas* provides no separate basis or separate analysis, however, for the requirement that an insurer must provide the insured with notice of changes in coverage.  The Court in *Thomas* rejected the notion that an insured's duty to read the insurance policy required a page by page inspection as evidenced by the fact that "the requirements of § 33-15-1106, MCA (1991),

11

suggest otherwise." *Thomas*, ¶ 28. The Court's conclusion that "the insurer has the burden to prove that it provided adequate notice of policy changes to its insured" emanated from this statutory basis. *Thomas*, ¶ 29. Section 33-15-1106, MCA (1991), set forth an insurer's duty to provide notice of policy changes. *Thomas* provides additional analysis of this statutory duty.

¶32 Robertus asserts that this Court has upheld the public policy that "an insurer may not place in an insurance policy a provision that defeats coverage" in the context of UIM coverage since well before 1996. *E.g. Bennett v. State Farm Mut. Auto. Ins. Co.*, 261 Mont. 386, 389, 862 P.2d 1146, 1148 (1993). This Court considered in *Bennett*, upon certification from the Ninth Circuit Court of Appeals, whether Montana public policy rendered void a clause that prohibited stacking of UIM coverage provided by separate policies. *Bennett*, 261 Mont. at 388, 862 P.2d at 1147.

¶33 Bennett asserted that she was entitled to stack UIM coverage for two separate State Farm insurance policies that covered two different vehicles after an underinsured motorist struck and injured her. Both policies limited Bennett's UIM coverage to $100,000 per person and $300,000 per accident. *Bennett*, 261 Mont. at 388, 862 P.2d at 1147-48. The Court affirmed longstanding Montana public policy that "an insurer may not place in an insurance policy a provision that defeats coverage for which the insurer has received valuable consideration." *Bennett*, 261 Mont. at 389, 862 P.2d at 1148. The Court concluded that Montana public policy renders void an insurance clause that prohibits stacking of UIM coverage provided by separate policies from the same insurer. *Bennett*, 261 Mont. at 390,

12

862 P.2d at 1149. Robertus argues, therefore, that the Court's decision in *Holeman II* plays no part in the question of whether Montana law allowed stacked UIM coverage at the time of his accident in December 1996.

¶34     Farmers Union counters that the District Court correctly concluded that Montana law did not prohibit anti-stacking provisions for UIM coverage until the Court decided *Holeman II* in 1998. Farmers Union points to the statement in *Farmers Alliance Mut. Ins. Co. v. Holeman*, 278 Mont. 274, 924 P.2d 1315, (1996) (*Holeman I*), that the legislature had left to policy interpretation the question of whether UIM coverage can be stacked. Farmers Union further argues that the Court in *Holeman II* distinguished *Bennett* on the grounds that *Bennett* involved two separate insurance policies. We disagree.

¶35     The Court decided *Holeman I* on the issue of whether the statutory prohibition against stacking of required coverages pursuant to § 33-23-203, MCA (1995), precluded stacking of UIM coverage. *Holeman I*, 278 Mont. at 275-76, 924 P.2d at 1316-17. *Holman I* did not discuss whether Montana law otherwise prohibited anti-stacking provisions for UIM coverage. The Court's comments regarding the legislature's intent to leave that question to policy interpretation refers merely to the longstanding public policy affirmed in *Bennett*. *Holeman I*, 287 Mont. at 281, 924 P.2d at 1320.

¶36     *Holeman II* also did not announce a new rule when it concluded that insurers may not prohibit stacking of UIM coverages where one policy covered multiple vehicles. *Holeman II*, ¶ 47. Farmers Union asserts that this holding constituted a new rule, and not a continuation of *Bennett's* statement of Montana public policy, as evidenced by the fact that

13

*Bennett* concerned stacking of UIM coverages under more than one policy. Although the Court in *Holeman II* stated that *Bennett* was "arguably distinguishable" on its facts, the reasoning of *Bennett* nevertheless governed its analysis. *Holeman II*, ¶ 43. The Court rejected as immaterial the fact that two separate policies were at issue in *Bennett*. *Holeman II*, ¶ 43. The Court concluded that "the overriding public policy considerations upon which we relied in *Bennett* mandate that Holeman be permitted to stack the [UIM] coverages in this case." *Holeman II*, ¶ 44. The Court affirmed *Bennett's* rule; it did not clearly distinguish *Bennett*. *Holeman II*, ¶¶ 43-44.

¶37  *Bennett* affirmed Montana public policy that this Court will not enforce an anti-stacking provision regarding UIM coverage because "an insurer may not place in an insurance policy a provision that defeats coverage for which the insurer has received valuable consideration." *Bennett*, 261 Mont. at 389, 862 P.2d at 1148. *Holeman I* and *Holeman II* reinforced that public policy. The factual distinctions between *Bennett* and *Holeman I* and *II* did not alter this basic public policy. This basic public policy existed and governed insurance policies like the Robertuses' before this Court decided *Bennett* in 1993, and certainly in 1996, when Farmers Union modified the Robertuses' insurance policy. *Bennett*, 261 Mont. at 388-89, 862 P.2d at 1148.

¶38  Robertus would have been entitled to stack seven UIM coverages for which he paid separate premiums under the pre-1996 policy according to longstanding Montana public policy. *Bennett*, 261 Mont. at 388-89, 862 P.2d at 1148. Stacking of the Robertuses' seven UIM coverages would have obligated Farmers Union to pay up to $2.1 million in UIM

14

coverage. Farmers Union admits that it intended to avoid that stacking when it modified the policy in 1996. Avoiding stacking of the seven UIM coverages would have limited Farmers Union's total financial obligation to $300,000. A policy modification intended to reduce the amount of UIM coverage to which Robertus was entitled by nearly $2 million dollars constitutes less favorable terms that required Farmers Union to provide notice under § 33-15-1106(1), MCA (1995).

## II.

¶39　We next must analyze the adequacy of the notice that Farmers Union provided Robertus. The District Court concluded that the changed UIM premium and the declarations page constituted adequate notice. The court contrasted the policy change from the one in *Thomas*. The Court noted that the modification in *Thomas* represented a subtle change to an obscure exclusion found within the main body of the policy. *Thomas*, ¶ 28. The District Court relied on the fact that the Court emphasized the obscurity of the policy modification in *Thomas* by noting that it was not of a kind that could be revealed on the declarations page or the forms and exclusions page. *Thomas*, ¶ 28.

¶40　The District Court also attempted to distinguish *Thomas* by noting that the UM/UIM modification accompanied other obvious changes. The court pointed to the fact that UM/UIM payments decreased from $199 to $116, and that the Robertuses' premium for the entire policy increased from $2,532 to $2,944. The District Court stated that it would "take judicial notice that a $400+ increase in ones [sic] insurance premiums from year to year is usually enough to cause one to look at the declarations page to see why." The District Court

15

further deemed it to be reasonable to expect the Robertuses to have noticed such changes to their UM/UIM coverage.

¶41 Robertus argues that the District Court improperly has placed upon an insured the burden of "figuring out" that a modification to the policy exists. Robertus cites Montana cases interpreting an earlier statutory duty to notify for the proposition that Montana law requires more notice, including, in one instance, a separate, written summary of policy changes. *Home Insurance Company v. Pinski Bros., Inc.*, 156 Mont. 246, 257, 479 P.2d 274, 280 (1971); *Fassio v. Montana Physicians' Service*, 170 Mont. 320, 327-28, 553 P.2d 998, 1001-02 (1976). Robertus also reasserts *Thomas's* rule that "when an insurer renews a previously issued policy, it has an affirmative duty to provide adequate notice to the insured of the changes in coverage." *Thomas*, ¶ 19.

¶42 *Thomas* considered whether a common law principle obligating an insured to read and examine the insurance policy tempers the insurer's duty to notify. *Thomas*, ¶ 26. The Court affirmed that "the extent of an insured's obligation to read the policy depends upon what is reasonable under the facts and circumstances of each case." *Thomas*, ¶ 27 (citing *Fillinger v. Northwestern*, 283 Mont. 71, 77, 938 P.2d 1347, 1351-52 (1997)). The Court determined that an insured does not have an absolute obligation to read a renewed insurance policy page by page to discover policy changes. *Thomas*, ¶ 28. The Court concluded that the statute instead imposed upon the insurer the burden to prove that it had provided to its insured adequate, affirmative notice of policy changes. *Thomas*, ¶¶ 25, 29.

¶43    Farmers Union argues that the District Court correctly distinguished *Thomas* based upon the nature of the modification at issue. The Court in *Thomas* stated that "a fair comparison of the policies . . . would reveal no significant changes in either the declaration page or the second page which scheduled the forms and exclusions." *Thomas*, ¶ 28. The District Court determined, and Farmers Union argues on appeal, that, here, by contrast, the change itself should have put the Robertuses on notice to an extent that relieves the insurer of providing additional notification.

¶44    We refuse to interpret *Thomas* so narrowly. The Court cited *Fillinger* for the proposition that "the extent of an insured's obligation to read the policy depends upon what is reasonable under the facts and circumstances of each case." *Thomas*, ¶ 27. *Fillinger* determined that the facts and circumstances include the nature of the relationship between the parties. *Fillinger*, 283 Mont. at 77-78, 938 P.2d at 1351-52. The relationship involves whether the insured is an "'unsophisticated individual[] who know[s] nothing about insurance,'" an "'experienced business person[] knowledgable about insurance,'" or a "'large corporation[] with batteries of lawyers.'" This reasoning also considers the complexity of the provision at issue. *Fillinger*, 283 Mont. at 78, 938 P.2d at 1352 (quoting *Martini v. Beaverton Ins. Agency, Inc.*, 838 P.2d 1061, 1067 (Ore. 1992)).

¶45    The modification to the Robertuses' policy appeared on the declarations page and accompanied a *decrease* in the amount that Farmers Union charged for UIM coverage and a $400 *increase* in the total premium. Farmers Union did not bury the modification deep within the policy. The modification cannot be considered, however, a simple, easy concept

to understand. To the contrary, the modification concerned stacking of UIM coverage for multiple vehicles covered under a single policy. Nothing in the record indicates that Robertus and his parents are experienced business people with knowledge of insurance, or a large corporation with batteries of lawyers. *Fillinger*, 283 Mont. at 78, 938 P.2d at 1352. The District Court unreasonably expected the Robertuses to grasp the significance of the policy changes based solely on the declarations page and the changed cost of the overall premium.

¶46     Section 33-15-1106(1), MCA (1995), imposed upon Farmers Union an affirmative duty to provide the Robertuses with adequate notice of a change in coverage that resulted in terms less favorable to the insured. *Thomas*, ¶¶ 28-29. The modified declarations page and modified amount that Farmers Union charged for the policy, standing alone, did not constitute adequate notice based upon the facts and circumstances of this case. We conclude that § 33-15-1106(1), MCA (1995), rendered ineffective the modification inserted into the Robertus's renewed insurance policy in December 1996 based upon Farmers Union's failure to provide adequate notice pursuant to Montana law. *Thomas*, ¶¶ 28-29. We need not address whether the District Court properly determined that the modified insurance policy precluded Robertus from stacking his UIM coverage in light of the fact that we determine that Farmers Union did not effectively modify Robertus's UIM coverage.

¶47     *Whether the District Court properly allowed Robertus to testify regarding a claim for future lost earning capacity.*

18

¶48 Farmers Union claims that Robertus's late discovery responses resulted in substantial prejudice to its defense. Farmers Union asserts that it could not reach a settlement as it had no opportunity to evaluate Robertus's claim for future lost earning capacity. Farmers Union points out that it was unable to assess Robertus's future lost wages claim, and, therefore, it could not conduct further discovery and obtain an expert to rebut Robertus's testimony. Farmers Union asserts that Robertus's dilatory discovery tactics amount to a blatant abuse of discovery.

¶49 The Court in *Morris v. Big Sky Thoroughbred Farms*, 1998 MT 229, 291 Mont. 32, 965 P.2d 890, concluded that the plaintiffs had abused the discovery process when they repeatedly had evaded a request for an admission that a civil rights claim did not apply to one of the defendants. *Morris*, ¶¶ 2-3, 16. The Court upheld the district court's imposition of discovery sanctions against the plaintiffs after two months had passed since the defendants' final request for admission. *Morris*, ¶¶ 4, 18. The Court concluded that the district court appropriately had sanctioned the plaintiffs for abusing the discovery process whether the plaintiffs' discovery deficiencies resulted from tactical trickery or mere carelessness. *Morris*, ¶ 16.

¶50 Discovery serves to "promote the ascertainment of truth and the ultimate disposition of the lawsuit in accordance therewith . . . [by] assuring the mutual knowledge of all relevant facts gathered by both parties which are essential to proper litigation." *Massaro v. Dunham*, 184 Mont. 400, 405, 603 P.2d 249, 252 (1979) (citing *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct. 385, 392 (1947)). Adherence to discovery and pre-trial procedures produces a

"'fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" *Richardson v. State*, 2006 MT 43, ¶ 22, 331 Mont. 231, ¶ 22, 130 P.3d 634, ¶ 22 (quoting *United States v. Procter & Gamble*, 356 U.S. 677, 682, 78 S. Ct. 983, 986-87 (1958)). This Court follows "a strict policy that dilatory discovery actions shall not be dealt with leniently." *Morris*, ¶ 13 (internal citation omitted).

¶51    Robertus provided an incomplete answer to Farmers Union's May 4, 2005, request for information regarding his claim for future lost wages. Robertus failed to consult an expert and to supplement his answer as he had promised in his initial response. Robertus finally answered Farmers Union's second interrogatory requesting supplemental answers relating to future lost wages on November 22, 2006, more than two months after the close of discovery and six months after the deadline to disclose expert testimony. Robertus's answer discussed future lost wages, but it failed to elaborate on how he would present evidence of future lost wages at trial. Robertus did not disclose his intention to testify himself regarding future lost wages until three days before the start of trial.

¶52    Robertus's conduct amounted to dilatory discovery tactics. This conduct prevented Farmers Union from assessing the merits of the Robertus's case. Farmers Union could not prepare adequately its defense, could not conduct follow-up discovery, and could not obtain its own expert to rebut Robertus's testimony regarding future lost wages in time for trial. The District Court abused its discretion when it allowed Robertus to testify regarding his claim for future lost earning capacity. *Morris*, ¶ 18; *Roedel*, ¶ 35. We remand for a new trial

20

on damages in light of the prejudice that Farmers Union suffered. We need not address Farmers Union's two additional cross-appeal issues for this reason.

¶53 We reverse and remand for further proceedings consistent with this opinion.


/S/ BRIAN MORRIS


We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER


Justice W. William Leaphart, dissenting in part and concurring in part.

¶54 I dissent as to the question of whether the District Court properly allowed Robertus to testify regarding a claim for future lost earning capacity. I concur in the Court's analysis of the other issues.

¶55 Robertus's actions in the discovery phase of the litigation do not rise to the level of abuse discussed in *Richardson v. State*, 2006 MT 43, 331 Mont. 231, 130 P.3d 634. Robertus eventually provided responses to Farmers Union's specific request for supplementation, including information about his new full time job. Contrary to *Richardson*, Farmers Union did not seek a motion to compel; Robertus did not fail to respond to a court order. *Richardson*, ¶¶ 7, 13. Farmers Union did not move to seek clarification of Robertus's

answers as it could have under M. R. Civ. P. 37(a)(2), and (3) nor did it ask that discovery be reopened to allow further depositions or ask that the trial be postponed.

¶56    I cannot conclude that the District Court abused its discretion when it allowed Robertus to testify as to future lost earnings despite his late discovery responses. *State v. Roedel*, 2007 MT 291, ¶ 35, 339 Mont. 489, ¶ 35, 171 P.3d 694, ¶ 35.


                                               /S/ W. WILLIAM LEAPHART


Justice Jim Rice, concurring in part and dissenting in part.


¶57    I concur with the Court's resolution of the cross appeal, but dissent from the Court's reversal of the District Court on the appeal issues.  I do not believe that Farmers Union was required to provide notice of the 1996 change in the method it calculated Robertuses' premium for UIM coverage.

¶58    The Court reasons that *Holeman II* "did not announce a new rule" permitting stacking of single-policy coverages because previous, generalized public policy statements against provisions which "defeat[ed] coverage for which the insurer has received valuable consideration," ¶ 36, were sufficient enough to communicate the specific message that anti-stacking provisions would not be enforced.  According to the Court, even though the Robertuses' pre-1996 policy contained an explicit anti-stacking provision, "Robertus would have been able to stack seven UIM coverages for which he paid separate premiums under the

22

pre-1996 policy," ¶ 38, despite the fact that no case or statute then permitted Robertus to ignore the anti-staking provision of his single policy. In my view, this is not a fair rendering of the law as it stood in 1996 and places a divination requirement upon Farmers Union which is unreasonable.

¶59 The pre-1996 policy contained express anti-stacking language notifying the Robertus family that only one $300,000 payment was available under their single Farmers Union policy. At the time Farmers Union changed its pricing structure to charge a single premium for UIM coverage on all vehicles, Montana law had not prohibited this anti-stacking provision. *Bennett*, decided in 1993, did not apply to this policy. Although we offered the observation eleven years later in *Dempsey* that anti-stacking policies had been "discouraged" in *Bennett*, the actual holding in *Bennett* permitted stacking of two *separate* policies for which *separate* premiums were paid. *Bennett*, 261 Mont. at 390, 862 P.2d at 1149 ("Bennett could reasonably expect to recover damages up to the limit of both policies under which she was an insured and for which separate premiums had been paid.") Beyond that, *Bennett's* general statement of public policy, that "an insurer may not place in an insurance policy a provision which defeats coverage," *Bennett*, 261 Mont. at 389, 862 P.2d at 1148, was certainly not a broad prohibition against all anti-stacking provisions. Indeed, two years later, we rejected stacking of coverages in *Chilberg v. Rose*, 273 Mont. 414, 417, 903 P.2d 1377, 1379 (1995), because the injured party was a passenger in a vehicle owned by an individual with three separate policies covering three separate vehicles. *Holeman I*, decided in 1996, merely determined that § 33-23-203, MCA, did not prohibit stacking of UIM coverages.

23

*Holeman I* did not hold that UIM coverages could be stacked if separate premiums were charged for each vehicle and, as the Court correctly observes, "*Holeman I* did not discuss whether Montana law otherwise prohibited anti-stacking provisions for UIM coverage." ¶ 35. Nonetheless, the Court concludes that a clear rule had somehow emerged from this uncertain precedent so that *Holeman II* "did not announce a new rule." I must disagree. There remained uncertainty in the law which generated considerable litigation over this issue. It was not until 1998, when *Holeman II* held that UIM coverages could be stacked because "separate premiums were charged for coverage of each motor vehicle listed within the policy," *Holeman II*, ¶ 47, that the rule applicable to this case emerged. That was *after* Farmers Union had changed the premium structure of the Robertus policy.

¶60    The Court's decision begs an interesting practical question. Given the facial validity of the pre-1996 policy under then-existing law, just what notice would Farmers Union have been required to give of the policy change at that time? Are insurance companies really required to give notice that they are revising a policy in a manner which does not change existing coverages, but so that, in the event the law changes in the future, the coverages in the policy will remain the same as currently provided? Are they supposed to notify insureds of policy changes made for the purpose of confirming an existing belief that an explicit provision of the policy which requires payment of the UIM limits only once is legal? Neither statute nor caselaw require that insurers give notice of such "nonchanges" in policy coverages for the purpose of satisfying potential future legal developments. Here, the Court takes the easy way out—it declares that Farmers Union's notification of the change in

24

premium was "inadequate," but offers not insight regarding how Farmers Union could have provided "adequate" notice under the law as it existed in 1996.

¶61 Farmers Union should not be held retroactively liable for its failure to comply with a rule pronounced subsequent to its actions in 1996. Although *Dempsey* made the stacking rule retroactive, the purpose of retroactivity is to apply the rule to pending cases—it does not require that Farmers Union bear responsibility for a rule announced years after it acted. I would affirm the District Court.

/S/ JIM RICE